

ATTORNEY FOR APPELLANT

Jill S. Swope
Sterba & Swope, LLP
Schererville, Indiana

ATTORNEY FOR APPELLEE

John M Rhame, III
Rhame & Elwood
Portage, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Marriage of:

Amy Steele-Giri,

*Appellant-Respondent,*

v.

Brian K. Steele,

*Appellee-Petitioner.*

July 29, 2015

Court of Appeals Case No.
45A04-1412-DR-600

Appeal from the Lake Superior
Court.

The Honorable Elizabeth F. Tavitas,
Judge.

Cause No. 45D03-0606-DR-617

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, Amy Steele-Giri (Mother), appeals the trial court's order denying her petition for modification of custody of the minor child, J.S., and rule to show cause in favor of Appellee-Petitioner, Brian K. Steele (Father).

We reverse and remand.

## ISSUES

Mother raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion by denying Mother's request for modification of child custody; and

(2) Whether the trial court abused its discretion by denying Mother's verified petition for rule to show cause.

## FACTS AND PROCEDURAL HISTORY[1]

---

[1] Pursuant to the provisions of the new Administrative Rule 9(G), certain evidence that was submitted to the court falls within the category of evidence that is declared confidential and which must be excluded from public access. *See, e.g.,* Administrative Rule 9(G)(2)(f) through (k). However, despite the parties' noncompliance with the Administrative Rule, we have endeavored to maintain confidentiality on appeal and, thus, approach the inclusion of certain facts with the necessary caution. But an appellate opinion that both decides the case and articulates the law requires consideration of the underlying facts. Accordingly, we have included a number of facts derived from the confidential records in this cause because "we deem such information to be public as essential to the resolution of the litigation and appropriate to further the establishment of precedent and the development of the law." *Drake v. Dickey*, 2 N.E.3d 30, 32 n.1 (Ind. Ct. App. 2013), *aff'd* 12 N.E.3d 875 (Ind. 2014).

[4] On April 24, 2007, the trial court entered a Decree of Dissolution of the marriage between Father and Mother. In its Decree, the trial court adopted the recommendation of the Guardian ad Litem (GAL) and instituted joint legal and physical custody over the parties' minor child, J.S., born on October 20, 2004. In 2009, Mother contemplated relocating to Sacramento, California, to follow her now-husband, Dr. Satyendra Giri (Dr. Giri), an interventional cardiologist, who had been offered a three-year employment contract in the area. At that time, Father had been co-habitating with his now-fiancee, Brenda Guth (Guth), for the previous two years, and was employed by Cabela's on a flexible schedule. Guth was a stay-at-home mom. GAL Christine Miller (GAL Miller), who had been appointed by the trial court as J.S.'s GAL, recommended in a written report, issued on July 24, 2009, that J.S. "should remain with [Father] and [Guth] to begin her schooling" with "joint legal custody and a duty to confer [] on any significant issues regarding health, education and religion." (Appellant's App. pp. 41, 42). Pursuant to GAL Miller's report, the trial court affirmed an Agreed Order modifying custody, support and parenting time on September 28, 2009. Following the Agreed Order, Father was given physical custody of J.S. with both parties sharing legal custody. With respect to parenting time, the entered Order provided, in pertinent part:

> 12. The parties agree that thereafter, Mother shall be entitled to parenting time in the same fashion as afforded above every four (4) to six (6) weeks.

13. The parties agree that Mother shall have parenting time for the week of [J.S.'s] Spring Break beginning the Friday school is let out until the Sunday prior to the return.

14. The parties agree that Mother shall also have summer parenting time beginning the first full week of June and ending three weeks prior to school resuming.

15. The parties stipulate that during this time, Father may have reasonable parenting time in California with [J.S.].

16. The parties agree that Mother is responsible for planning, reserving and paying for all airfare costs associated with transporting the child to and from California. Mother shall email Father with specific dates and times of future travel and Father shall ok or request a day/time change within 24 hours of Mother's email. Mother shall make every effort to have the trips planned and airfare purchased at least thirty (30) days prior to the event.

17. The parties stipulate that Mother shall have parenting time with [J.S.] when Mother is in Indiana. Mother shall provide notice to Father at least 48 hours in advance of her visit.

(Appellant's App. p. 46).

[5] In January 2013, Mother and Dr. Giri's son, J.S.'s half-brother, was born. Dr. Giri's contract in Sacramento had ended and the family decided to relocate to Coos Bay, in Oregon, where Dr. Giri had been offered a new position pursuant to a ten-year contract. Mother remained a stay-at-home mom.

[6] Father lost his position at Cabela's, and corresponding health insurance on J.S., in 2010. Because he did not inform Mother, GAL Miller reminded him that he needed to keep "mom in the loop." (Transcript p. 14). Around April of 2010, Father commenced a new position with Beta Steel, where he works 12-hour shifts. At the same time, Guth started a fulltime position with the Portage school system. As a result of Father's schedule, J.S. was enrolled in before

school care at the YMCA and after-school care at the Boys & Girls Club. Father did not inform Mother of these arrangements.

[7]  In September 2010, J.S. began Kindergarten. After testing, the school placed J.S. in the Title I Extended Day Kindergarten Program as she needed "extended time to master the Indiana Academic Standards for kindergarten." (Respondent's Exh. B). Father never informed Mother of this decision. Following first grade, J.S.'s school advised Father that "based on [J.S.'s] current level of academic progress in 1st Grade," attendance during summer school was advised. (Respondent's Exh. B). Father did not inform Mother of this recommendation, nor did he enroll J.S. in summer school or otherwise get J.S. the necessary tutoring. Similarly, following second grade, J.S.'s school notified Father that J.S. had "not made sufficient academic progress during the school year. In order to provide your child with time to become proficient with grade level expectations, summer school is necessary. It is therefore, MANDATORY that [J.S.] attend summer school." (Respondent's Exh. B). Although Father was notified twice of this summer school requirement, Father did not advise Mother of this decision, nor did Father enroll J.S. in summer school. During the 2013-14 academic year, J.S. was enrolled in third grade. Her end-of-year skill report shows some important formative skills "Not Mastered," including the areas of "Word Recognition, Fluency, and Vocabulary Development"; "Writing –Applications"; "Number Sense"; and "Measurement." (Respondent's Exh. C). After 5 months in third grade, J.S. tested at Grade Equivalent 3.1—*i.e.* "a level equal to that of a typical third

grader after the first month of the school year"—for reading. (Respondent's Exh. C). In the course of the third grade, J.S. participated in the ISTEP. She achieved a 450 in English/language arts (where a passing grade is scored between 417 and 780) and 448 in math (where a passing grade is scored between 413 and 735).

[8] Guth completed J.S.'s school registration forms and the forms needed for extended care options before and after school. On these forms, Mother was not listed as a contact person, nor was her contact information included. Specifically, on the before-school care registration, Guth was identified as "Parent/Guardian" with grandmother as the emergency contact; neither biological parent was mentioned on the form. (Respondent's Exh. D).

[9] Because Father has physical custody, J.S., aged 9 at the time of the current proceedings—resides at Father's residence with Guth and Guth's two children from a prior relationship—son A.G., aged 16 at the time of the current trial proceedings, and daughter M.G., aged 14 at the current trial proceedings. J.S. does not feel "welcomed" in the house by M.G. (Appellant's App. p. 68). Both girls share a room and fight "like siblings," with at times M.G. "physically shoving" J.S. (Tr. pp. 10, 11). GAL Miller testified that after several years of sharing a bedroom, M.G. now "just basically ignores" J.S. (Tr. p. 59). Throughout the years, J.S.'s feelings towards M.G. never changed.

[10] Father acknowledged that Guth can "be too strict with each of the children, especially [J.S.]." (Appellant's App. p. 63). Guth noted that "[M.G.] and

[Father] do not get along well" and she has requested Father "to be more sensitive to [M.G.] because she thinks that [M.G.] looks at Father's and J.S.'s relationship with full out jealousy." (Appellant's App. p. 77); (Tr. p. 60). During the weekends when Father has to work, J.S. remains with the paternal grandparents and frequently spends the night. At a certain point, J.S. "used to resist going home at the end of the weekends because of [M.G.]." (Appellant's App. p. 75). Although Father's family is close, the paternal grandparents refuse to accept Guth and do not welcome her. As a result, Father and Guth spend their holidays apart.

On August 15, 2013, Mother filed a verified petition for modification of custody and a verified petition for rule to show cause. On April 3, 2014, GAL Miller filed her report, concluding in pertinent part:

> I have reviewed the records subpoenaed by [Mother's counsel] and it would reflect that on many occasions, in fact, probably most occasions, [J.S.] remains at the Boys and Girls Club well after 4:30[p.m.] On an average about five (5) times a month, she remains at the Boys and Girls Club until after 6:30 p.m. and on some occasions has been there after 8:00 at night. Her days can be very long, beginning between 6:00 a.m. when [Guth] awakens her and ending when Father or [Guth] finally pick her up from the Boys and Girls Club.

> Whereas, the change in circumstances in Mother's home that she is a stay-at-home mother and has given birth to [J.S.'s] biological brother presents a different situation for [J.S.], where she can wake up in the comfort of her own bed, have breakfast with her family, and leave for school directly from the breakfast table and not make at least two (2) bus exchanges in a 9 to 12 hour day.

> It also troubles me that at [Father's] house J.S. has been forced to share a bedroom with her Father's girlfriend's daughter, with whom

she has not been able to happily coincide for all these years. I would never suggest that a child be placed in the home because there is more money available; however, there is no doubt that [J.S.] would have her own room in [Dr. Giri] and [Mother's] 4-bedroom home.

When [Father] speaks of being punished, I can understand what he is saying. [Father] does do everything he can and, by all accounts, is a wonderful father. He reads books with her at night. [J.S.] adores her Father. She adores his parents. But it is a sad fact that [Father] has to work to provide for his family, and working at Beta Steel requires some exorbitant hours to make a decent wage. His records reflect that he worked 27 out of 31 days last May. [] However, the sacrifices made in time with his daughter are very significant. It seems sad for [J.S.] that she spends most of her time with others instead of her own parents or biological brother. In fact, there is probably little question but that she spends more time with [Guth] and that [Guth] currently acts as more of a care provider than anything else. All of the sign-in sheets and the documentation at the schools indicate that [Guth] is frequently the person who transports [J.S.] in the mornings and afternoons and cares for her.

Of course, in some ways it is a negative mark against Father that [J.S.] is not happy enough in her home in his absence that she must visit with her grandparents. At first blush, that is how one would interpret it. However, upon further contemplation, it occurs to one that [J.S.'s] close relationship with her paternal grandparents is a point against moving to Oregon. Grandma [] has been vocal to [GAL Miller] that she and her husband simply cannot afford to travel back and forth to visit [J.S.] and that she worries that her relationship with her granddaughter would be forever altered or limited.

. . .

[J.S.'s] potential life with her mother in Oregon is quite appealing. . . . [J.S.] is blessed to have two (2) parents who love and adore her, and she is aware of this fact. She would no more choose between her parents than be tortured.

It would be nice if [J.S.] could have an opportunity to live with her Mother in Oregon for a year to see if she flourished in that setting. However, this [GAL] makes no formal recommendation.

(Appellant's App. pp. 79-81).  On April 14 and June 30, 2014, the trial court conducted a hearing at which both parties presented evidence.  On November 21, 2014, the trial court entered its Order, denying Mother's request for modification of custody and rule to show cause.

[12]  Mother now appeals.  Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[13]  In this case, the trial court entered findings of fact and conclusions thereon in its Order denying the modification of custody.  Pursuant to Indiana Trial Rule 52(A), our court will "not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."  *D.C. v. J.A.C.,* 977 N.E.2d 951, 953 (Ind. 2012).  Where, as here, the trial court entered such findings and conclusions *sua sponte*, the specific findings control only as to the issues they cover, and while a general judgment standard applies to any issue upon which the trial court has not found, we may affirm a general judgment on any theory supported by the evidence adduced at trial.  *Sexton v. Sedlak*, 946 N.E.2d 1177, 1183 (Ind. Ct. App. 2011), *trans. denied*.

[14]  In addition, there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters."  *Swadner v. Swadner*, 897 N.E.2d 966, 971 (Ind. Ct. App. 2008) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993)).  "[A]ppellate courts 'are in a poor

position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *D.C.*, 977 N.E.2d at 956-57 (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). Our State's courts have long emphasized a concern that there be finality in matters concerning child custody. *Baxendale v. Raich*, 878 N.E.2d 1252, 1258 (Ind. 2008). "Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses." *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1190 (Ind. Ct. App. 2014), *trans. denied*.

## II. *Modification of Custody*

### A. *Findings of Fact*

[15] Prior to turning to the main issue before us, we address Mother's contention that several of the trial court's *sua sponte* findings are not supported by the evidence and therefore are clearly erroneous and should be set aside.

### 1. Finding # 4(e)

[16] In its Order denying modification of custody, the trial court found

> Since the last court order, Mother married her boyfriend, [Dr. Giri], in 2010. Their son, [L.G.] was born in January, 2013. [J.S.] has a loving and endearing relationship with her step-brother, and a good relationship with Dr. Giri.

(Appellant's App. p. 19).  Pointing out the genetic and familial relationship, Mother asserts that her minor son is J.S.'s half-brother, and not step-brother as indicated by the trial court.  Father does not dispute this claim but notes that this is merely "a scrivener error at worst."  (Appellee's Br. p. 8).  We agree.  The trial court acknowledges the blood lineage between J.S.'s half-brother and J.S. later in its Order when it references Mother's stay-at-home status "since the birth of her son."  (Appellant's App. p. 19).  Accordingly, we do not consider this Finding to be erroneous, merely misstated.

### 2.  Finding # 4(f)

The contested Finding # 4(f) provides as follows:

> Father has had a long term relationship with his live in girlfriend, [Guth].  They have lived together for nine years.  Guth's two children, [A.G.], 16 years old, and [M.G.], 14 years old, also live at the residence with Father and [J.S.]  It is undisputed that [M.G.] and [J.S.] fight "like sisters."  There was no evidence that the fighting was anything more than sibling rivalry.  There was no evidence of physical violence between the girls.  There was no evidence that Father or Guth played favorites with either child.  The girls share a bedroom.  Father and Guth have taken extra steps to ensure that both girls have their private space to the best of their ability.  [J.S.] has a good relationship with [Guth] and [A.G.].

(Appellant's App. p. 19).  Referencing GAL Miller's testimony and report, Mother claims that "there was significant evidence," which supported the notion that the relationship between J.S. and M.G. "was anything but acceptably sibling in nature, very concerning and outright miserable for [J.S.]."  (Appellant's Br. p. 11).  We agree.

[18] Whereas sibling rivalry is characterized by jealousy, competition, and animosity among siblings, irrespective of a blood relationship, the evidence presented at trial paints a situation much bleaker than the ordinary fight "like sisters." (Appellant's App. p. 19). The record reflects that throughout the years, J.S. has harbored severe antipathy towards M.G, a feeling that has never wavered. In May or August of 2012, J.S. mentioned that "she hated [Guth] and [M.G.]" (Tr. p. 17). Although relayed by Mother to GAL Miller, this statement was later independently confirmed by J.S. Furthermore, the trial court's absolute statement of no evidence of physical violence must be nuanced as the evidence clearly reflects that M.G. "physically" shoves J.S. (Tr. p. 10). GAL Miller testified that the situation has now reached the point where "M.G. just basically ignores" J.S. (Tr. p. 59).

[19] The relationship between the girls is exacerbated by the clear favorites played by Father and Guth vis-à-vis their respective biological daughter. Father does not get along with M.G. and needs "to be more sensitive" to M.G.'s feelings. (Tr. p. 60). On the other hand, Guth can be "too strict with the children, especially [J.S.]." (Appellant's App. p. 63). All this has created an atmosphere which J.S. escapes during the weekends when Father has to work. Not feeling welcome at her own home, J.S. spends those weekends with her grandparents and "used to resist going home at the end of the weekends because of [M.G.]." (Appellant's App. p. 75). In light of the evidence presented at the hearing, we conclude that the trial court's Finding # 4(f) is clearly erroneous and must be set aside.

### 3. Finding # 4(h)

[20] The contested Finding 4(h) describes:

> Since the entry of the last order, [J.S.] has adjusted well to school and the community where her Father lives. [J.S.] has also adjusted to the parenting schedule and enjoys time with both her Mother and Father.

(Appellant's App. p. 19). First, focusing on J.S.'s academic performance, Mother contends that J.S.'s "struggles with school, reading and mathematics" cannot be equated to a well adjusted school environment. (Appellant's Br. p. 13). Documenting J.S.'s progress, from Kindergarten until the ISTEP results in third grade, Mother claims that J.S. is denied an opportunity to reach her full academic potential.

[21] The evidence is clear that by the second semester of her third grade, J.S. was testing slightly below her grade level. Commencing in Kindergarten, where she attended Extended Day Kindergarten because she "needed extra time to master" Indiana's Academic Standards, to first and second grade, where she was recommended and later required to attend summer school, the evidence reflects that J.S. continuously needed extra help to keep up. (Respondent's Exh. B). Yet, Father repeatedly failed to enroll her in summer school or otherwise get her the necessary help. Nevertheless, by the end of third grade, J.S.'s skills report indicates several formative skills "Not Mastered" and she tested at least 4 months behind a typical third grade reading level. (Respondent's Exh. B). Her ISTEP scores place her within the lowest passing tier.

[22] J.S.'s academic skills are not aided by the enormous amounts of time J.S spends in daycare—be it before or after school. GAL Miller testified that

> [J.S.] gets up in the morning. If dad's working [Guth] wakes her up and [Guth] picks out her clothes. And she wakes up between 6:00 and 6:30, but she'll [] go the Y-Care in the morning. And I think [Guth] has to be too, where she works at a school. She works another elementary school in Portage. I think [Guth] has to be there by 7:00 or 7:15. So, she's dropping [J.S.] off right before that.
>
> And then she goes to school. And then she takes a bus to the Boys and Girls Club. She eats at Y-Care. She's there around 7:00[a.m.]. She's there around 7:00[a.m.] because [Guth] has to be at work at 7:15.
>
> And then from Y-Care, she gets on the bus and goes to her elementary school, George Myer's Elementary School around 8:00am. And then after school she gets on the bus to go to Boys and Girls School[.]
>
> * * *
>
> Like from November [2013] until early March [2014], [J.S.] was at the Boys and Girls Club well after 6:00 o'clock p.m. . . . some are like 7:59, you know, p.m., at night.
>
> I tell you what, that's something that [Guth] was definitely not candid with me about. And even [Father], I'm not sure he was candid, but he didn't certainly offer it. He said, well, occasionally, she likes to stay late on Friday nights. They both sought to downplay how long she was there after school.

(Tr. pp. 41-42, 49). Understandably, GAL Miller frowned on J.S.'s long days and their possible influence on J.S's academic performance as for "any of us who have 12 and 13 hours a day in a structured setting, it can be demanding." (Tr. p. 55). J.S.'s school schedule and the length of J.S.'s days "causes [GAL Miller] concern" and she opined to "want something else for [J.S.]." (Tr. p. 54). Although GAL Miller noted that J.S. is happy, she added that "[J.S.] at this point in time is conditioned to not complain about anything." (Tr. p. 80). When questioned about J.S.'s long school days, Father testified that it is his

"intent to continue on the present schedule." (Tr. p. 193). Accordingly, we conclude that the trial court's categorical finding that J.S. is well adjusted to school is erroneous, as the evidence depicts a more different situation.

[23] With respect to J.S.'s adjustment to the community, Mother merely references J.S.'s home situation and her acrimonious relationship with M.G. Besides having already addressed these concerns above, we find that community in this setting encompasses more than solely the home environment. As Mother did not present any evidence to the contrary, we affirm that part of the trial court's Finding indicating J.S.'s adjustment to the community.

## 4. Finding # 4(i)

[24] Lastly, Mother contests trial court's Finding # 4(i), which provides:

> There were no issues raised regarding the mental health or the physical health of [J.S.], the parties, or any other person who may significantly affect the child's best interest.

(Appellant's App. p. 19). Claiming that the trial court erroneously discounted these issues, Mother points to Father's safety precautions with respect to his firearms, Father's struggle with anxiety and depression, and J.S.'s dental care.

[25] The testimony reflects that Father locks his guns in a safe. Although this was "barely acceptable" for GAL Miller, it was "not that big of an issue . . . it's not a deal breaker." (Tr. p. 74.). While Mother presents Father as struggling "with anxiety and depression," GAL Miller clarified that this should be understood as Father being "fearful that if [J.S.] moves to Oregon he would not see her

again." (Appellant's App. p. 64). Finally, Mother alludes to Father's handling of J.S.'s cavities and a recurring problem with warts which Father had not communicated to Mother. However, we cannot conclude that these minor health problems amount to a physical health issue; rather, it appears that Mother takes issue with Father's non-communication and lack of consultation of these problems. Accordingly, the trial court's Finding is not erroneous.

### B. *Substantial Change Warranting Modification*

[26] Turning to Mother's main contention, we note that a party seeking a change of custody must persuade the trial court that (1) modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider in initially determining custody:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>     (A) The child's parent or parents;
>
>     (B) The child's sibling; and
>
>     (C) Any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>     (A) home;
>
>     (B) school; and
>
>     (C) community.
>
> (6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic violence by either parent.

(8) Evidence that the child has been care for by a de facto custodian.

Ind. Code § 31-17-2-8.

[27] "In the initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating the existing custody should be altered." *Kirk*, 770 N.E.2d at 307. Custody matters typically turn on factual determinations and will be set aside only if such determinations are clearly erroneous. *Baxendale*, 878 N.E.2d at 1257. "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Kirk*, 770 N.E.2d at 307.

[28] In denying Mother's request for modification of custody, the trial court concluded that "there has been no significant change in circumstance in Father's situation that would justify a modification of custody." (Appellant's App. p. 21). Because a change in circumstances must not only be substantial, as required by the statute, this change "must be judged in the context of the whole environment[.]" *Jarrell*, 5 N.E.3d at 1193. Most importantly, "[t]he effect on the child is what renders a change substantial or inconsequential." *Id*. By solely focusing on Father's situation as its predominant and decisive factor without regard of the totality of the change and—most importantly—its impact on J.S., we conclude that the trial court applied an erroneous standard. Viewing the complete familial environment as presented at trial, we hold that a

significant change in circumstances occurred that warrants a modification of custody.

[29] Since the entry of the Agreed Order which granted Father physical custody of J.S., much has changed. Mother married Dr. Giri and moved to a more permanent location in Oregon. Together with her husband, Mother has given birth to a son, J.S.'s half-brother, and has become a stay-at-home mom. J.S. loves her new sibling, visits often, and speaks daily with Mother either by telephone or facetime. "While changes in the non-custodial household, including remarriage, may now be considered, substantial factors other than remarriage must also be present." *Bryant v. Bryant*, 693 N.E.2d 976, 979 (Ind. Ct. App. 1998), *trans. denied*.

[30] Father has changed employment and is now employed in a more demanding position, with shift and weekend work. Father's fiancée is no longer a stay-at-home mom but is employed in a fulltime position by the school district. J.S. has started school and, due to the demands of Father's and Guth's positions, spends an exorbitant amount of time at daycare—before school as well as after school. Despite a loving Father, J.S. does not feel "welcomed" in the home. (Appellant's App. p. 68). The clear animosity between J.S. and Guth's daughter, M.G., is not aided by parents who play favorites with their respective biological daughter. All this creates an atmosphere that J.S. escapes on those weekends that her Father has to work. Instead of spending the weekend at home, J.S. stays with the paternal grandparents and "used to resist going home at the end of the weekend because of [M.G.]." (Appellant's App. p. 75).

[31]   Mother contends that J.S.'s situation prevents her from reaching her full academic potential. Commencing in Kindergarten through third grade, the school either placed J.S. in an extended program or recommended and required summer school. Nevertheless, by the end of the third grade, J.S.'s skills tested slightly behind grade level: several formative skills were "Not Mastered" and she tested at least 4 months behind a typical third grade reading level. (Respondent's Exh. B). Even though J.S. passed the ISTEP, her scores reflect her to be a weak student.

[32]   We agree with GAL Miller that J.S.'s academic performance is in large part influenced by the significant amount of time spent in daycare. GAL Miller indicates that J.S.'s school days can result in "12 to 13 hours a day spent in a structured setting" with several days a month where J.S. is picked up well after 6:00p.m. (Tr. p. 55). Even when Father was not scheduled to work, the record reflects that J.S. was sent to daycare instead of taken to school in the morning or being picked up early in the evening. Father never informed Mother of J.S.'s time spent in before and after-school care.

[33]   While in daycare, either before or after school, Father does not allow J.S. to complete her homework or read. Rather, the testimony reflects that J.S. will complete her homework and "read every night for 30 minutes" in whatever little time is available to her in the evening after dinner and before her "bedtime [of] 8:30 [p.m.]." (Tr. pp. 170, 257). Despite J.S's academic difficulties in keeping pace with her grade level, Father claims she is "doing better" and he has every intention "to continue on the present schedule." (Tr. pp. 184, 193).

[34] Throughout J.S.'s formative years, Mother was unaware of the school's recommendations and J.S.'s report cards. Father admitted never having shared or consulted with Mother about J.S.'s placement in the Extended Day Kindergarten, nor was Mother informed or consulted with regard to the school's recommendation and requirement for summer school despite their joint legal custody. Ultimately, Mother and GAL Miller contacted the school directly to be added to J.S.'s online parent access. Mother now meets regularly in person with J.S.'s teachers when she is in Indiana. Despite being added to the online access, Mother still does not receive—and Father does not forward—the reports which are not posted online. Even though Father claims that Mother has not asked for these missing reports, it is clear that Mother cannot request something she does not realize she should be getting. Lately, Father enrolled J.S. in a counseling session at school for children of divorced parents without Mother's knowledge or consent. The evidence establishes that Father relies on J.S. to inform Mother of all her educational results, academic progress, health problems, and extracurricular activities.

[35] Furthermore, Guth, who completed the school registration and daycare forms, did not include Mother as a contact person, nor was her contact information completed. Specifically, on the before-care registration, Guth was listed as "Parent/Guardian" and grandmother as the emergency contact; neither biological parent was mentioned on the form. (Respondent's Exh D).

[36] Mother is not informed or consulted with regard to J.S.'s extracurricular activities. This has led to Father being upset when J.S. needs to skip activities

because Mother intends to take J.S. on a family visit during her rare parenting time weekends in Indiana. Moreover, the record reflects that Mother, during the first hearing of the current proceedings, suggested to use a shared Google calendar to keep both parents informed of J.S.'s schedule. Although Mother sent Father an invitation to that effect in between the first and second hearing, Father was disinclined towards the idea and did "nothing with that." (Tr. p. 278). While both parents share legal custody over J.S., it has become abundantly clear that Father is driving the educational and health care decisions without knowledge or input from Mother. Generally, lack of cooperation or isolated acts of misconduct between the parents cannot serve as a basis for the modification of custody. *See Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans. denied*. However, where, as here, parents with joint legal custody have made child-rearing a battleground to the point that they have placed their child's mental and physical welfare at stake, the trial court may modify the custody order. *See id*. We find that, under the instant circumstances, Father's recurring and admitted non-communication of J.S.'s academic results and recommendations to Mother has placed J.S.'s educational growth and success in jeopardy.

[37] Viewed in "the context of the whole environment," we must conclude that a substantial change in circumstances has occurred. *Jarrell*, 5 N.E.3d at 1193. Since the entry of the Agreed Order, the situation of both Mother and Father has markedly changed. J.S. has started school and has grown into a hardworking, yet struggling student, who now spends numerous hours a day in

daycare—much to the detriment of her academic pursuits as she is not allowed to read or complete her homework while not at home. Many weekends are spent with grandparents as J.S. does not feel welcome at home when Father is at work.

[38] While we acknowledge the deference entitled to the trial court's rulings in family law matters, in cases such as these, where the evidence at trial presents a different picture and the findings of the trial court are rife with errors, we have to reevaluate the level of deference granted. *See D.C.*, 977 N.E.2d at 956-57. Although Father is a loving parent, following these significant and continuing changes in circumstances, a transfer of physical custody to Mother is in J.S.'s best interests. J.S. already spends a substantial amount of time in Oregon and has made friends there. Mother is in a better position to build a welcoming home and to guide J.S. through her formative academic years as she is a stay-at-home mom who is willing to invest the time needed to help J.S. reach her full potential. J.S. "has arrived at the doorstep of adolescence, and the onset of puberty." *Sabo v. Sabo*, 858 N.E.2d 1064, 1069 (Ind. Ct. App. 2006) (where we affirmed the trial court's award of physical custody to mother during the child's school year). She has reached the age which is characterized by change and growth, not only emotional and social, but physical as well and where a mother can be a guiding force. Accordingly, we reverse the trial court's denial of modification of custody, grant physical custody to Mother, and remand to the trial court for determination whether joint legal custody would be in J.S.'s best

interest and to establish Father's parenting time schedule in line with the Indiana Parenting Time Guidelines where distance is a factor.

### III. *Rule to Show Cause*

[39] Mother contends that the trial court abused its discretion by denying her petition to hold Father in contempt of court. Mother maintains that Father willfully violated the court's Agreed Orders to share authority and responsibility for the major decisions concerning J.S.'s upbringing, including her education and health care.

[40] "Contempt of court involves disobedience of a court which undermines the court's authority, justice, and dignity." *Srivastava v. Indianapolis Hebrew Congregation, Inc.*, 779 N.E.2d 52, 60 (Ind. Ct. App. 2002), *trans. denied*. Whether a person is in contempt of a court order is a matter left to the trial court's discretion. *Mitchell v. Mitchell*, 785 N.E.2d 1194, 1198 (Ind. Ct. App. 2003). We will reverse the trial court's finding only where an abuse of discretion has been shown, which occurs only when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id*. When we review a contempt order, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id*.

[41] In order to be held in contempt for failing to comply with a court order, a party must have willfully disobeyed the order. *Deel v. Deel*, 909 N.E.2d 1028, 1032 (Ind. Ct. App. 2009). "The order must have been so clear and certain that there could be no question as to what the party must do, or not do, and so there could

be no question regarding whether the order is violated." *Id*. (citing *Ind. High Sch. Athletic Ass'n v. Martin*, 765 N.E.2d 1238, 1241 (Ind. 2002)).

[42] The Agreed Order between the parties instituted joint legal custody, which "means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." I.C. § 31-9-2-67. In this regard, Mother averred in her petition that Father failed to keep her informed about the school's summer school recommendations, J.S.'s report cards, and J.S.'s long school days. Father failed to provide Mother's contact information on J.S's registration forms and denied Mother parenting time with her daughter on two separate occasions.

[43] Upon conducting a hearing on Mother's petition for rule to show cause, the trial court concluded

> Mother has failed to satisfy her burden of proof that Father should be held in contempt. The [c]ourt finds that Father has not willfully failed to comply with the joint legal custody order. There have been incidents where the parties have failed to communicate regarding the child's school progress. The information was available to both parties. Father's failure to advise Mother of a situation is not a willful violation of the order, when the same information is available to Mother directly from the school. Father has wrongfully assumed that information was passed on to Mother through the child is enough. Both parties are admonished that the child is not a messenger, and that any information that should be exchanged must be relayed by one party to the other.

(Appellant's App. p. 21). We cannot affirm the trial court's decision.

[44] Father unequivocally admitted during the hearing that he never shared the school's letter "that [J.S.] was determined to be at risk" and would be placed in Extended Day Kindergarten. (Tr. p. 252). He admitted to never having shared the school's request to place J.S. in summer school after first grade or the school's requirement to place her in summer school after second grade. Instead of contacting Mother and advising her of the school's recommended placements, Father made the unilateral decisions not to enroll J.S. in summer school.

[45] Father admitted in his appellee's brief that "[i]t is clear that [Father] did not relay all the information that under a normal joint custody arrangement[] would be expected to be transmitted and then discussed." (Appellee's Br. p. 20). Despite Mother's request, Father did not provide Mother with online access to J.S.'s school records. It took GAL Miller's involvement to get Mother the access Father should have allowed her. GAL Miller testified that it is "concerning to [her] that major issues [J.S.] clearly had in her educational experience were not being shared with a joint legal custodial parent." (Tr. p. 34). Although Mother has currently online access to school records, the evidence establishes that Mother still does not receive all school reports. Even as late as the second hearing on Mother's petition, Father presented a school report for admission that Mother had not previously seen. Despite the trial court's finding that the information was available to both parties, Father admitted that the online portal does not contain all the reports issued by the school. Even in light of Father's acknowledgment, Father did not forward

these missing reports to Mother, nor did Father provide the school with Mother's contact information. In fact, J.S.'s school records do not include Mother's telephone information or mailing address—if Mother's name is listed at all. Father's claim that Mother did not ask for those reports is not well taken as it is difficult to request something one is not aware of. Mother "did not know that J.S. attended the Boys and Girls Club after school every day." (Tr. p. 133). In fact, Mother did not become aware of this attendance until J.S. told her during the summer of 2013. Mother was advised of J.S.'s before care at the YMCA by GAL Miller in the fall of 2013.

[46] Mother is not informed of J.S.'s extracurricular activities. Despite Mother's request to use a shared calendar to document J.S.'s interests, Father is nonresponsive to the idea. Furthermore, Father denied Mother parenting time with J.S. on J.S.'s birthday in 2010 and during the fall of 2010. Again, GAL Miller had to become involved to solve this dispute.

[47] While an accidental oversight does not rise to the level of willful disobedience of a court's order, here, it is clear that Father is passive-aggressive in excluding Mother's participation in J.S.'s upbringing. Despite his awareness of the trial court's Agreed Order and his statutory obligation to share information with Mother, Father refuses to do so, instead claiming that the flow of information between the parties is "pretty good." (Tr. p. 207). Prior to filing the instant cause, at the end of the summer of 2013, Mother requested a meeting with Father to discuss J.S.'s academic development; Father responded "no, thank you. Go ahead and file." (Tr. p. 147). As such, the claim that "[Father] is

certainly not sowing seeds of discord; he just wants to maintain his daughter from intrusions into his and her life that are disruptive" is not only preposterous but also accurately encapsulates Father's intent to view this court-ordered communication with Mother and between J.S. and Mother as increasingly upsetting to his own life. (Appellee's Br. p. 22).

[48] Due to the totality of the evidence before us, we find that trial court's decision denying Mother's petition for rule to show cause is against the logic and effect of the facts and circumstances. Rather, the combined instances of willfully ignoring the directives of joint legal custody are so blatant that to disregard these would be to incentivize Father to continue on the trodden path. Accordingly, we find Father to be in contempt of the trial court's Agreed Order instituting joint legal custody of J.S. Uncontradicted evidence that a party is aware of a court order and willfully disobeys it is sufficient to support a finding of contempt. *Crowl v. Berryhill*, 678 N.E.2d 828, 830 (Ind. Ct. App. 1997). Thus, "[o]nce a party has been found in contempt of court, monetary damages may be awarded to compensate the other party for injuries incurred as a result of the contempt." *Phillips v. Delks*, 880 N.E.2d 713, 720 (Ind. Ct. App. 2008). Therefore, we remand to the trial court for determination of Mother's monetary damages, if any.

## CONCLUSION

[49] Based on the foregoing, we conclude that the trial court erred in denying Mother's request for modification of custody. We reverse the trial court's

Order, grant physical custody of J.S. to Mother, and remand to the trial court for determination whether joint legal custody would be in J.S.'s best interest and to establish Father's parenting schedule in line with the parenting time guidelines where distance is a factor. Additionally, we reverse the trial court's denial of Mother's petition for rule to show cause, find Father in contempt, and remand to the trial court for determination of Mother's monetary damages, if any.

Reversed and remanded with instructions.

Bailey, J. concurs

Barnes, J. dissents with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Marriage of:
Amy Steele-Giri,

*Appellant-Respondent,*

v.

Brian K. Steele,

*Appellee-Petitioner.*

Court of Appeals Cause No.
45A04-1412-DR-600

## Barnes, Judge, dissenting.

I respectfully dissent. The standard of review in child custody matters is well-settled. "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). This is because, "enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests

of the involved children." *Id*. On appeal, it is not enough that the evidence might support some other conclusion, it must positively require the conclusion urged by the appellant before there is a basis for reversal. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002).

[54] In my opinion, this is not a case in which the evidence compels the modification of custody to Mother. Despite evidence of both parents' shortcomings, the guardian ad litem testified that Mother and Father "are good involved parents" and agreed that J.S. has "a wonderful relationship with each of her parents[.]" Tr. pp. 70, 67. The guardian ad litem declined to make a firm recommendation in this case because it was "such a close call." *Id.* at 66. Based on this evidence, I believe this is the very circumstance in which long-standing precedent requires us to defer to the trial court's assessment of witnesses and to affirm the trial court's decision. For these reasons, I dissent.