## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 29 2016, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Philip C. Sheward
Dawn E. Wellman
Josh Van Gorkom
Allen Wellman McNew Harvey, LLP
Greenfield, Indiana

ATTORNEY FOR APPELLEE

Thomas N. Leslie
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roger A. Andrick,

*Appellant-Petitioner,*

v.

Angela L. Andrick,

*Appellee-Respondent.*

April 29, 2016

Court of Appeals Cause No. 33A04-1508-DR-1211

Appeal from the Henry Circuit Court

The Honorable Kit C. Dean Crane, Judge

Trial Court Cause No. 33C02-0611-DR-157

**Barnes, Judge.**

# Case Summary

Roger Andrick ("Father") appeals the trial court's denial of his petition to modify custody of his son, N.M. We affirm in part and remand in part.

# Issues

The issues before us are:

> I.      whether the trial court's findings and conclusions regarding Father's modification request are clearly erroneous; and

> II.      whether the trial court properly ordered Father to pay a large percentage of Mother's attorney fees.

# Facts

N.M. was born in 1999. Father is not N.M.'s biological father, but he adopted N.M. in 2004. Angela Andrick ("Mother") and Father were together for approximately four years and were married for two years before their divorce was finalized in January 2007. Mother originally was granted primary physical custody of N.M. and Father was allowed "reasonable" visitation. App. p. 11. Father filed two petitions to modify custody, one in January 2010 and the second in December 2011. Following the second petition to modify, the parties reached a mediated settlement regarding custody that provided Mother with continuing primary physical custody. However, Father was granted a substantially increased amount of parenting time, including increased weekend and summer visitation, totaling 150 overnights per year.

[4] This new parenting arrangement began in May 2012, at the end of N.M.'s sixth-grade year. During sixth grade, N.M. earned four As, two Bs, and one C; he also was absent a total of ten days. N.M.'s grades and attendance declined somewhat in seventh grade, the 2012-13 school year. His grades included some Ds and Fs, but also several As; he was absent for twenty-one-and-one-half days. Between seventh and eighth grade, Mother moved from the Perry Township to Franklin Township school districts in Marion County. During N.M.'s eighth grade year, 2013-14, his grades consisted of several Ds and Cs as well as some As and Bs. He was absent a total of approximately twenty-one days.

[5] Toward the end of that school year, in May 2014, Mother's father became seriously ill. Mother assisted in her father's care, and N.M. also spent much time with his ailing grandfather. N.M. missed some additional school time in the fall of 2014, but Mother arranged to pick his homework up from school on those days. Mother's father passed away in early December 2014.

[6] N.M.'s grades at the end of his first semester in high school included an F, 3 Cs, a D, a B, and an A. N.M. also missed a large amount of school time during the first semester, especially in the second quarter, when he missed approximately fifteen days. Many of these absences were related to the illness and death of Mother's father and were excused by the school. In January 2015, Mother had a discussion with a school counselor regarding N.M.'s grades and it was discovered that, although N.M. completed much of his homework, he was failing to turn it in, which had a large negative impact on his grades. After this meeting, N.M. turned in his homework more frequently. His grades at the end

of his freshman year included two Bs, a C, C+, B-, and one A. His attendance also was greatly improved in the second semester.

[7] In September 2014, Father contacted the Indiana Center for Children and Families ("ICCF") for a referral for counseling services for N.M. because of what Father believed was N.M.'s conflict with other children living in Mother's home—namely the children of Mother's live-in fiancé, G.G. and B.G.—and N.M.'s alleged unhappiness in that home. ICCF referred N.M. to counseling with Jessica Buescher, to which Mother agreed. N.M. had a number of appointments with Buescher in the fall of 2014. Buesher diagnosed N.M. with "adjustment disorder," after N.M.'s discussion of wanting to hit G.G. and not coping well with stress. Ex. 2, p. 33. Buescher believed this disorder likely arose after Mother and Father's divorce. N.M. also repeatedly discussed with Buescher his desire to live with Father and his belief that Mother was not emotionally supportive. N.M. also described a lack of connection with Mother's fiancé. After Father filed his petition to modify custody on November 13, 2014, N.M. reiterated his desire to live with Father, and also mentioned a "loopy" person living in Mother's house at that time, which caused him additional stress. Ex. 2, p. 24. This person was a recovering alcoholic and longtime friend of Mother's. However, Mother's communication with N.M. also was improving at this time.

[8] At an appointment in December 2014 after Father filed his custody modification petition, Buescher attempted to encourage N.M. to discuss his wishes regarding custody modification with Mother present. Mother responded

that she did not believe it was appropriate to discuss custody in that setting in light of Father's petition to modfiy, and she terminated the counseling sessions with Buescher thereafter. On December 22, 2014, Buescher wrote a report stating in part,

> Per this therapist's, [sic] recommendation [N.M.]'s overall emotional, physical, and mental health needs are being met at both parents homes on different levels based on their circumstances. [N.M.] is not in harm in either home. It is solely based on [N.M.]'s preference that he live with his adoptive father over his mother. At this time, this therapist cannot make a determination about the best placement in either home.

Ex. 2, p. 21.

[9] On March 9, 2015, the trial court appointed a guardian ad litem ("GAL") to investigate the case and represent N.M.'s interests. The GAL met with N.M. several times in each parent's home. The GAL filed a report on July 2, 2015, but did not testify at the change of custody hearing. N.M. told the GAL that his biggest difficulties living with Mother were "drama" and lack of privacy. App. p. 42. N.M. described the "drama" in Mother's home as arising from frequent conflicts between Mother and G.G., such as shouting matches lasting ten to twenty minutes, two to three times a week. The lack of privacy was related to G.G., and G.G.'s little brother B.G. when he is at the home, walking into N.M.'s room unannounced. The GAL and N.M. discussed the fact that moving in with Father would require N.M. to transfer from Franklin Central to Fishers High School; N.M. indicated that would be acceptable to him, given

that he already knows some friends who attend Fishers, and that spending more time on the weekends with Mother actually would allow him to spend more time outside school with his Franklin Central friends. The GAL discussed with N.M. and Father the fact that Father's job requires him to leave home well before N.M. leaves for school, and whether that would be a potential problem given N.M.'s past attendance issues. N.M. said he would be able to walk the four blocks from Father's home to Fishers High School if he missed the bus. The GAL also related in her report N.M.'s wishes regarding custody:

> The GAL does not as a rule ask children "where they want to live." However, it became apparent that [N.M.] has had a clear idea on what he wanted and the GAL asked him about his ideas about his parenting plan. [N.M.] indicated that he would like to "flip-flop" the current parenting arrangement such that he would be with Father from Sunday evening through Thursday after school and every fourth weekend and with Mother every Thursday overnight and for 3 consecutive weekends from Friday after school to Sunday evening.

App. p. 53.

[10] The GAL also discussed conditions at Mother's house. The GAL believed much of the house smelled of animal urine, which Mother blamed on G.G.'s failure to clean the litter box as frequently as he was supposed to as part of his chores. The GAL also believed there was mold in the basement, to which the

GAL had an allergic reaction.[1] Ultimately, the GAL recommended "[t]hat the parenting time plan for [N.M.] be 'flip-flopped' from the current schedule." Id. at 66.

[11] Shortly before the modification hearing, N.M. went to a counseling appointment with Matt Greene, a therapist recommended by the GAL. After that appointment, Greene stated that he did not believe N.M. required ongoing counseling and that no further appointment was needed at that time.

[12] The trial court held the modification hearing on July 13, 2015. At the hearing, Mother testified that N.M. and G.G. sometimes had non-physical fights over things such as G.G. borrowing N.M.'s shoes or clothes without permission. Otherwise, she described G.G. and N.M. as getting along like brothers, playing football, baseball, and basketball together and talking about girls. At the time of the hearing, N.M. was trying out for the Franklin Central baseball team and appeared to be excited about being in classes in the fall at Franklin Central, where he has a number of male and female friends.

[13] After the hearing, the trial court conducted an in camera interview of N.M. Originally, Father had requested such an interview. At the beginning of the modification hearing, Father asked that the trial court not conduct the

---

[1] There is no evidence in the record that N.M. suffers from any mold-related illness.

interview, but Mother objected to Father's request, and the trial court stated it would conduct the interview but not make a record of it, per its usual practice.

[14] On July 27, 2015, the trial court entered its order denying Father's modification petition. The order was accompanied by findings and conclusions, at Father's request. Among other things, the trial court found:

> 63. Father also claims [N.M.] wishes to live with him and early on in the treatment with Jessica Buescher (September of 2014) [N.M.] indicated his preference to do so.
>
> 64. Meetings with Buescher ended in December, 2014, and there are indications [N.M.]'s preference from eight (8) months ago have changed.
>
> 65. [N.M.] has also stated most recently that he wishes to remain in his Mother's home and is looking forward to attending Franklin Central High School again.

[15] App. p. 15.

[16] Regarding N.M.'s counseling with Buescher, the trial court found in part, "The therapist was unable to state in court whether further counseling would have been beneficial to [N.M.] and expressed no opinion on the matter." *Id.* at 20. Regarding school, the trial court found in part,

> 153. It was after the death of Angela's father that [N.M.] seems to have made a turn around.
>
> 154. [N.M.]'s attendance at school has soared along with his grades.

155. Coincidentally, [N.M.]'s depression mood seems to have subsided throughout the second semester.

*****

175. [N.M.]'s ninth grade grades and attendance seem to indicate not only improvement but potential emergence from [N.M.]'s adjustment disorder.

176. To change custody, and thus to change high schools, classmates, taking away [G.G.], and taking away [N.M.]'s mother from his daily life, invites a recurrence of the adjustment disorder or symptoms akin thereto.

*****

178. The GAL did not address the fact that [N.M.] would be living alone with his Father and that he ([N.M.]), who has attendance problems at school, would be required to get himself ready for school four out of five days of the week.

179. The GAL did not address the potential, as opined by Ms. Buescher, as suggested by Father's history suggesting he will at some future date be living again with another female adult with children as has, according to her report, happened on three (3) occasions in the past.

180. As to placement, neither the GAL nor Ms. Buescher have recommended a change of placement, and therefore, have made no recommendation as to a change of custody.

[17]    *Id.* at 22-25.

[18] The trial court made the following statements regarding the standard for modification of custody:

> 192. Father bore the burden of proving that the existing custody order is unreasonable and should be altered due to a substantial change in circumstances occurring since the date of the previous custody decree and affecting the child's welfare. *Cunningham v. Cunningham*, 787 N.E.2d 930 (Ind. Ct. App. 2003).
>
> *****
>
> 194. Further, the party pursuing modification bears the burden of demonstrating that the existing custody order is unreasonable. *Haley vs. Haley*, 771 N.E.2d 743 (Ind. Ct. App. 2002).
>
> 195. In modification proceedings, the change in the custodial home must be one of a decisive, substantial and continuing nature. *In Re Marriage of Henderson*, (1983) Ind.App., 453 N.E.2d 310.
>
> *****
>
> 197. The failure of the parent seeking modification to allege and prove a decisive change in conditions should result in the denial of that modification. *Owen v. Owen*, 563 N.E.2d 605, 608 (Ind. 1990).
>
> *****
>
> 217. The court finds that both Angela and Roger are loving and caring parents; [N.M.] is fortunate to have them both. However, the court finds that based on the provisions of the custody modification statute, Father has not met his burden of showing

changed circumstances so substantial so as to warrant a change of custody and that it would not be in his best interests to move to his Father's residence in Fishers.

[19] *Id.* at 26-28.

[20] With respect to attorney fees, the trial court found that Father had an income three times greater than Mother's, and also that he had additional financial resources, including a 401(k). Based primarily upon financial disparity, the trial court ordered Father to pay $15,000 towards Mother's attorney fees and litigation costs of nearly $19,000. Father now appeals.

## Analysis

### I. Child Custody Modification

[21] We review decisions regarding custody modifications for an abuse of discretion and must give "'latitude and deference to our trial judges in family law matters.'" *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). Additionally, the trial court here entered findings and conclusions pursuant to Indiana Trial Rule 52(A), at Father's request. In reviewing such findings, we first determine whether the evidence supports the findings and second whether findings support the judgment. *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *Id.* "A judgment is also clearly

erroneous when the trial court applies the wrong legal standard to properly found facts." *Id.* "Additionally, even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *M.K. Plastics Corp. v. Rossi*, 838 N.E.2d 1068, 1074 (Ind. Ct. App. 2005).

[22]    Under Indiana Code Section 31–17–2–21, a court may not modify a custody order unless the petitioner shows that (1) the modification would be in the best interests of the child, and that (2) a substantial change has occurred in one or more of the factors a court must consider under Indiana Code Section 31–17–2–8. *L.C. v. T.M.*, 996 N.E.2d 403, 407 (Ind. Ct. App. 2013). Those factors are:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parent or parents;
> >
> > (B) the child's sibling; and
> >
> > (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

     (A) home;

     (B) school; and

     (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Ind. Code § 31-17-2-8.

[23]    Father challenges a number of the trial court's findings. The first finding that Father takes issue with is that the GAL had not "recommended a change of placement, and therefore, ha[s] made no recommendation as to a change of custody." App. p. 25. Plainly, the GAL did recommend in her report "[t]hat the parenting time plan for [N.M.] be 'flip-flopped' from the current schedule." *Id.* at 66. The trial court's finding that the GAL did not make a custody recommendation is clearly erroneous. It is true that a trial court "'is not required to accept the opinions of experts regarding custody . . . .'" *Maddux v. Maddux*, 40 N.E.3d 971, 980 (Ind. Ct. App. 2015) (quoting *Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000)). Here, however, the trial court did not

simply fail to accept the GAL's opinion regarding custody, it misstated that opinion.

[24] Also with respect to the GAL, Father claims the trial court erred in finding the GAL "did not address the potential" that a female adult could move in with Father at some time in the future, given three occurrences in the past following the divorce on which adult women lived with Father. *Id.* at 24. The GAL did note Father's past in this regard but not the possibility of it happening in the future; thus, the trial court's finding technically is not clearly erroneous. In any event, as Father argues, whether another woman may live with Father at some point in the future seems to be of minimal relevance here.[2] To the extent the trial court placed some relevance upon it, we disregard it.

[25] Father also challenges the trial court's findings with respect to N.M.'s wishes regarding custody. Specifically, the trial court acknowledged that N.M. told Buescher during his counseling sessions with her that he would prefer to live with Father. However, the trial court also found, "[N.M.] has also stated most recently that he wishes to remain in his Mother's home and is looking forward to attending Franklin Central High School again." *Id.* at 15. The trial court also entered a conclusion stating, "While [N.M.] at one time expressed preference to live with Father, it is clear from the evidence he wants to go to

---

[2] In a report, Buescher stated that there was a possibility Father would not always be single and other children could enter his life at some point, "and that should be taken into consideration pending a final decision of [N.M.]'s placement." Ex. 2, p. 20. It is unclear that Buescher intended for Father to be "penalized" for having had more live-in relationships following the divorce than Mother.

Franklin Central High School. He cannot attend FCHS and live with Father." *Id.* at 27. The trial court also concluded, "While [N.M.] at one time expressed an opinion he wanted to live with his Father nearly a year ago, it is evidence that with the emergence from his depression; his overcoming his adjustment disorder; [N.M.] is showing all the signs he wishes to remain in Franklin Central and to live with his Mother." *Id.* at 28.

[26] We must agree with Father that it is unclear how the trial court reached the conclusion that N.M. had changed his mind regarding custody. The trial court makes no mention in its findings of the GAL's report regarding N.M.'s wishes, which were that "he would like to 'flip-flop' the current parenting arrangement . . . ." App. p. 53. The GAL did not specify precisely when N.M. told her this, but she was not appointed until March 2015, or considerably closer in time to the modification hearing than the counseling with Buescher upon which the trial court exclusively focused regarding N.M.'s wishes, and did not file her report relating N.M.' wishes until shortly before the hearing. Additionally, such a "flip-flop" in schedule would necessitate a change in N.M.'s school, but according to the GAL this did not seem to concern N.M., contrary to the trial court's findings that N.M. clearly wanted to continue attending Franklin Central.

[27] We acknowledge that the trial court conducted an in camera interview of N.M., and it is possible N.M. expressed to the trial court that he had changed his mind regarding custody. However, the trial court's findings and conclusions make no mention of what N.M. said during the in camera interview, nor was any record

of it made. The trial court, by statute, was not required to make such a record. *See* I.C. § 31-17-2-9 (stating "a record *may* be made of the interview"). Nonetheless, we are hesitant to assume that the trial court's finding regarding the change in N.M.'s wishes was supported by the in camera interview, particularly where special findings were requested and the trial court failed to mention what N.M. had told the GAL. *See Baxendale v. Raich*, 878 N.E.2d 1252, 1258 (Ind. 2008) ("Obviously, we can speculate that the court's in camera interview also affected the court's conclusion as to the child's wishes. But there is nothing in the record that gives us any basis to conclude that this factor was significant in the trial court's ruling."); *see also McCauley v. McCauley*, 678 N.E.2d 1290, 1292 (Ind. Ct. App. 1997) ("The trial court did conduct an in camera interview with J.M., and we might speculate from the language of the trial court's finding that his decision was based upon that in camera discussion. However, the trial court's judgment may not rest primarily upon the results of a private in camera interview."), *trans. denied*. Additionally, N.M.'s wishes were crucial in this case, and an accurate assessment of them is vital. In the absence of any indication of how or when N.M. said he had recently said he wanted to continue living with Mother, we deem the finding that he had done so to be clearly erroneous.

[28] Father also argues that the trial court clearly erred in finding that Buescher "was unable to state in court whether further counseling would have been beneficial to [N.M.] and expressed no opinion on the matter." App. at 20. This finding is

partially true, but certainly does not reflect the entirety of Buescher's testimony. Specifically, Buescher testified:

> Q:     Had you been in control of the situation, would you have elected to stop seeing [N.M.] in December?
>
> A:     No, I would have continued to probably see him for . . ., as long as his treatment goals were necessary.
>
> Q:     So, from your standpoint, you weren't done working with him yet?
>
> A.     Right.  Yeah.
>
> Q:     Do you think that it would have been helpful for [N.M.] to continue working with you at that juncture:
>
> A:     Yes.
>
> Q:     Do you think that it would have been in [N.M.]'s best interest to continue to work with you at that juncture?
>
> A:     Yes.
>
> Q:     Do you have an opinion regarding whether or not the decision to stop counseling with you was good for him?
>
> A:     No.  No opinion.

Tr. pp. 46-47.  Thus, in fact, Buescher did express that she thought it would have been best for N.M. to continue counseling in December 2014, but

confusingly she did also state that she had no opinion on whether it was good to stop his counseling at that time. In any event, the trial court's finding is incomplete with respect to whether Buescher believed N.M. should have continued counseling with her, contrary to Mother's decision to stop. At the very least, Buescher seemed to have mixed feelings on the matter.

[29] In addition to these erroneous findings, Father points out that the trial court several times stated incorrect, outdated, and overly-stringent legal standards for modifying custody. The trial court twice stated in its conclusions of law that Father bore the burden of proving that the existing custody order is "unreasonable," and also stated that he had to prove "a decisive, substantial and continuing" change in conditions of the custodial home before a modification could be granted. App. p. 26-27. However, in 1994 the legislature amended the child custody modification statute to remove the requirement of "unreasonableness" before modification could be ordered. *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1258 (Ind. Ct. App. 2010). Additionally, after this amendment, "the change in circumstances required by Section 31–17–2–21 need not be so decisive in nature as to make a change in custody necessary for the welfare of the child. . . . Rather, the change in circumstances must be substantial." *Id.* (citing *Joe v. Lebow*, 670 N.E.2d 9, 21 (Ind. Ct. App. 1996)). *See also In re Marriage of Sutton*, 16 N.E.3d 481, 487 n.5 (Ind. Ct. App. 2014)

(noting that cases decided before amendment of modification statute applied "very strict" standard that no longer exists).[3]

[30]  Father also contests the trial court's findings regarding N.M.'s grades and school attendance, and contends the trial court erred in omitting any mention of the GAL's concerns regarding the condition of Mother's home. We do not believe it is necessary to address those findings or lack thereof at this time. Rather, we focus upon the fact that the trial court made erroneous or unsupported findings in three vital areas. First, it plainly misstated the GAL's opinion regarding modification of custody; the GAL recommended a modification of custody but the trial court said she had not done so. Although the trial court was not required to accept her opinion, it gives us pause that the trial court may have been unaware of or misjudged her opinion. Second, it is unclear how the trial court arrived at the finding that N.M. no longer wanted to live primarily with Father. The wishes of a child, particularly a child over fourteen years old such as N.M., are one of the statutory factors to consider when deciding whether to modify custody. *See* I.C. § 31-17-2-8(3). Although we traditionally have been hesitant to allow modifications of custody based solely upon a child's changed wishes, it certainly is an important consideration

---

[3] We acknowledge that the trial court cited two post-1994 cases from this court for the proposition that a parent seeking modification of custody must prove that the existing custody order is unreasonable: *Cunningham v. Cunningham*, 787 N.E.2d 930, 935 (Ind. Ct. App. 2003), and *Haley v. Haley*, 771 N.E.2d 743, 747 (Ind. Ct. App. 2002). *Haley*, in turn, cited *Fields v. Fields*, 749 N.E.2d 100, 108 (Ind. Ct. App. 2001), *trans. denied*. *Cunningham*, *Haley*, and *Fields* should no longer be cited for the proposition that an existing custody order must be shown to be unreasonable before modification may be ordered.

that may reinforce other factors favoring a modification of custody. *See Sutton*, 16 N.E.3d at 486. The trial court's findings also fail to give a completely accurate picture of Buescher's beliefs regarding whether it was advisable for N.M. to stop attending counseling sessions in December 2014. The particular importance of this question is that N.M. was addressing with Buescher difficulties he was having in his interaction with Mother, Mother's live-in fiancé, and other children in Mother's home, and Buescher believed further counseling would have benefitted N.M. A change in a child's interaction and interrelationship with his or her parents, or "any other person who may significantly affect the child's best interests," may support a modification of custody, as may a change in the mental health of a child. *See* I.C. § 31-17-2-8(4), (6). N.M.'s counseling with Buescher was related to such interactions and interrelationships and N.M.'s mental health.

[31] We may disregard erroneous findings if there are enough other valid findings and conclusions such that the erroneous findings are "superfluous and harmless as a matter of law." *M.K. Plastics Corp.*, 838 N.E.2d at 1074. We have great difficulty in saying that the erroneous or unsupported findings we have noted can be deemed "harmless" or merely "superfluous." This is especially true given that the trial court several times noted a standard for modification of custody that placed a higher burden of proof upon Father than currently exists under Indiana law. Even if the trial court had not made any erroneous factual findings, the judgment may be clearly erroneous if the trial court applied the wrong legal standard in ruling upon Father's petition to modify. *See K.I. ex rel.*

*J.I.*, 903 N.E.2d at 457. Given the erroneous findings on crucial issues we have identified and the trial court's repeated recitation of an incorrect legal standard, we lack confidence in the accuracy of the judgment.

[32] Father requests that we reverse the denial of his modification petition and direct that he be awarded primary custody of N.M. We are not prepared to go that far. The evidence in this case arguably could support a result in favor of Mother. We emphasize that in order to outright reverse a denial of custody modification, it is not enough that the evidence might have supported a modification; rather, the evidence must "'positively require'" modification. *Kirk*, 770 N.E.2d at 307 (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). We need not engage in a detailed review of all of the cases Father has cited in which we reversed outright a denial of custody modification. We will briefly note the case of *Steele-Giri v. Steele*. Father cited our opinion in this case as an example of one in which we reversed a denial of custody modification based upon what the majority deemed to be erroneous findings. *See Steele-Giri v. Steele*, 40 N.E.3d 513 (Ind. Ct. App. 2015). However, our supreme court recently issued an opinion on transfer, ruling that the findings in that case were not clearly erroneous and emphasizing the deference to be given to trial courts in family law matters. *See Steele-Giri v. Steele*, No. 45S04-1512-DR-00682 (Ind. Mar. 15, 2016). We recognize the need for such deference, but must conclude here that there are several erroneous or

unsupported findings and that the trial court applied an erroneous legal standard.[4]

[33] Under the circumstances, we conclude it would be most prudent to remand this case to the trial court for further consideration. This would include reconsideration of the case in light of the GAL's recommendation and either altering the findings regarding N.M.'s wishes and Buescher's thoughts regarding counseling, or supporting those findings more thoroughly, and then applying the correct legal standard to the findings. *See Hyde v. Hyde*, 751 N.E.2d 761, 768 (Ind. Ct. App. 2001) (remanding for reconsideration of marital property division after erroneous findings were identified on appeal). We do not believe it is necessary for the trial court to conduct a new hearing in this matter. However, in the interests of resolving this child custody matter expeditiously, we direct the trial court to enter new findings and conclusions in this case within thirty days of certification of this opinion. *See Wolljung v. Sidell*, 891 N.E.2d 1109, 1113 (Ind. Ct. App. 2008) (ordering trial court to conduct new hearing on child custody modification within thirty days of our opinion remanding case based upon trial court's failure to consider statutory factors related to relocation of a parent).

---

[4] The author of this opinion dissented in *Steele-Giri* when it was before this court and finds the present case to be distinguishable.

## II. Attorney Fees

[34] Father also challenges the trial court's order directing him to pay $15,000.00 of Mother's total attorney fees and costs of $18,796.29 related to the modification proceedings. Under Indiana Code Section 31-15-10-1(a):

> The court periodically may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this article and for attorney's fees and mediation services, including amounts for legal services provided and costs incurred before the commencement of the proceedings or after entry of judgment.

The purpose of this statute is to ensure that parties who otherwise could not afford an attorney in dissolutions and dissolution-related matters have access to an attorney's services by requiring the other party to contribute to such costs. *Capellari v. Capellari*, No. 37A05-1505-DR-479 (Ind. Ct. App. Dec. 22, 2015) (citing *Beeson v. Christian*, 594 N.E.2d 441, 443 (Ind. 1992)). A non-exclusive list of factors a court may consider when deciding to require one party to pay the attorney fees of the opposing party includes the resources of the parties; their relative economic circumstances; their ability to engage in gainful employment and earn adequate income; which party initiated the action; whether fees and expenses were incurred due to a party's misconduct; and the ability of a party to pay. *Masters v. Masters*, 43 N.E.3d 570, 576 n.8 (Ind. 2015).

[35] Father's brief fails to mention the statutory basis for awarding attorney fees in dissolution-related proceedings. He focuses primarily upon the absence of evidence of any misconduct by him during these proceedings in arguing that the

attorney fee award should be reversed. However, there are other factors that weigh in favor of that award. As found by the trial court, Father has earned income that is nearly three times that of Mother, and he has financial assets she does not have, such as a 401(k). Also, Father initiated the current action, necessitating Mother's hiring of an attorney. An award of attorney fees in a dissolution-related action is proper if one party is in a superior position to pay such fees. *Hartley v. Hartley*, 862 N.E.2d 274, 287 (Ind. Ct. App. 2007). The trial court's findings, which Father does not challenge, indicate that Father was in such a superior position. To the extent Father contends the trial court could or should have ordered him to pay less than $15,000 towards Mother's attorney fees, because that amount is in excess of the three-to-one ratio in Father's and Mother's incomes, he cites no authority for the proposition that trial courts must precisely align an attorney fees award to reflect each party's financial situation. We conclude that the trial court's award of $15,000 in attorney fees to Mother is not clearly erroneous.

## Conclusion

[36] We remand for reconsideration of the denial of Father's custody modification petition, in light of the trial court erroneous or unsupported findings and possible application of an erroneous legal standard. Such reconsideration and issuance of new findings and conclusions shall take place within thirty days of this opinion's certification. We affirm the award of attorney fees to Mother.

[37] Affirmed in part and remanded in part.

Altice, J., concurs.

Robb, J., dissents in part and concurs in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Roger A. Andrick,

*Appellant-Petitioner,*

v.

Angela L. Andrick,

*Appellee-Respondent.*

Court of Appeals Case No.
33A04-1508-DR-1211

**Robb, Judge, dissenting in part and concurring in part**

I respectfully dissent from the majority's decision to remand this case to the trial court for further consideration.

I reiterate the standard for reviewing the trial court's findings and conclusions: we will not set aside the findings or judgment unless they are clearly erroneous. T.R. 52(A). Findings are clearly erroneous when the record contains no facts to support them, either directly or by inference. *Hurt v. Hurt*, 920 N.E.2d 688, 691 (Ind. Ct. App. 2010). The judgment is clearly erroneous when no evidence supports the findings, the findings fail to support the judgment, or the trial court uses an incorrect legal standard. *In re B.J.R.*, 984 N.E.2d 687, 697 (Ind. Ct. App. 2013). We will not substitute our own judgment for that of the trial court

if any evidence or legitimate inferences support the trial court's judgment. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). However, "[t]he judgment will be reversed if it is clearly erroneous." *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011) (citation omitted), *trans. denied*.

Here, as the majority determines, several of the trial court's findings were clearly erroneous. *See* slip op. at ¶ 30. Moreover, the majority holds these erroneous findings were neither superfluous nor harmless, *see id.* at ¶ 31, as they went to the heart of the matter: the GAL's recommendation regarding custody; N.M.'s wishes regarding custody; and the advisability of continued counseling as it related to N.M.'s interaction and relationships with his parents and others in the home, his adjustment to his home, and his mental health. In addition, the trial court used an incorrect legal standard in assessing whether custody should be modified and the majority therefore "lack[s] confidence in the accuracy of the judgment." *See id.* With all of this, I agree. What I cannot agree with, however, is that despite these many significant factual and legal errors on the part of the trial court, the majority determines that reversal is not appropriate and instead remands to the trial court for further consideration. *See id.* at ¶ 32-33.

Rather than remand for the trial court to fix the multitude of errors explained by the majority opinion, I would reverse. I am given some pause by the fact the trial court interviewed N.M. in chambers sometime during the two weeks between the hearing and issuing its order. However, if what N.M. said about his wishes in chambers was so different from how others had testified, the trial

court should have indicated that in some way in its findings. As it stands, the evidence of record does not support even an inference that N.M. had changed his mind about where he wanted to live. Although that is not the only criteria weighing on a modification of custody, it is a significant factor, especially when coupled with the trial court's complete misstatement regarding the GAL's recommendation. As the majority notes, our supreme court has stated that "it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Kirk*, 770 N.E.2d at 307; *see also* slip op. at ¶ 32. The court also noted, however, that "[t]his is not to say that the circumstances of a custody or visitation case will never warrant reversal." *Kirk*, 770 N.E.2d at 307 n.5. I believe this is one of those cases. When the crucial findings are set aside as clearly erroneous, and the correct legal standard is applied, the evidence of the factors relevant to a modification decision demonstrate the judgment itself is clearly erroneous and must be reversed.

With respect to the attorney fees issue, I concur.